In the Matter of the Application of ETHEL HENNESSY WILLIAMS, Administratrix, etc., of JAMES HENNESSY, Also Known as JAMES J. HENNESSY, Deceased, for an Inquiry Pursuant to Section 205 of the Surrogate's Court Act in the Estate of JAMES HENNESSY, Deceased.

ETHEL HENNESSY WILLIAMS, as Administratrix, etc., of JAMES HENNESSY, Deceased, Petitioner, Respondent; MARGARET COFFEY, Appellant.

First Department, December 23, 1937.

*James D. C. Murray* of counsel [*George J. Gruenberg* with him on the brief; *John J. Sammon,* attorney], for the appellant.

*John Holley Clark, Jr.,* of counsel [*James T. Murray* with him on the brief; *Eleanor F. Hamilton,* attorney], for the respondent.

DORE, J.   This is an appeal from a surrogate's decree in a discovery proceeding adjudging that twelve certificates of stock and three savings bank pass books belong to the estate of the deceased,

James Hennessy, and directing the appellant to deliver the property to the petitioner, the administratrix of the estate. The administratrix claimed that the property belonged to the estate. Margaret Coffey, the appellant, asserted title and ownership in her by reason of a gift *causa mortis* made to her by the deceased on January 11, 1935, three days before his death. The surrogate held that the gift *causa mortis* had not been established, that any delivery of the property by the deceased to the appellant was solely for purposes of safekeeping, and that it had been returned to the deceased before his death.

Most of the facts are undisputed. The deceased was a second cousin of the appellant whom he had brought from Ireland in 1922 with his sister, Ellen Hennessy, who had sustained an injury on a visit there. At that time James Hennessy was sixty-five years old and his sister Ellen was an invalid. It was established by wholly disinterested testimony that the appellant resided with deceased and his said sister for many years from the time of her arrival in New York until the sister's death in 1928 and during those years devoted all her time to the care of the invalid sister and also of the deceased, who, during the same period, began to suffer from cardial valvular disease, hardening of the arteries, and hypertension. Appellant did the cooking, laundry, housework, nursing, and served as personal attendant to the sister who never went out without her.

James Hennessy's appreciation of these years of devoted service and his gratitude to the appellant were evidenced by letters to her, by the confidence and trust he concededly reposed in her, and by his frequently repeated statements — established by disinterested testimony — that his sister should have made some provision for the appellant in her will and that he intended fully to provide for her. The learned surrogate in his first opinion, by error, inadvertently stated that the appellant had been a beneficiary of Ellen's will but corrected and withdrew this in a second opinion, as the evidence was to the contrary.

In that same first opinion the learned surrogate emphasized a misconception of another important bit of evidence, the appellant's letter dated January 12, 1934, a year before the decedent's death, which the court, through inadvertence, assumed was dated on January 12, 1935, one day after the claimed gift *causa mortis*. The court in a later decision corrected this and stated that the earlier date of the letter made inapplicable the comment based upon the phrase, " I took all his bank books for safety," and also made inapplicable the conclusion that the letter was an admission that there was no gift *causa mortis* but merely a delivery for purposes of

safety, and the erroneous conclusion from said letter was withdrawn.

James Hennessy, after his sister's death, moved to California in 1929, but returned to New York in the early part of 1932 and at first lived at the Nassau Hotel in East Fifth-ninth street, so as to be near appellant who then worked and lived in the Manhattan Eye, Ear and Throat Hospital at 210 East Sixty-fourth street. Later he moved to a room at a Mrs. Finley's, 500 West One Hundred and Twenty-second street, and thereafter into a room at a Mrs. Daly's on the ground floor of the same address, where he remained until his death on January 14, 1935, at the age of seventy-eight. During this period (1932–1935) the appellant visited him frequently, and he also came to see her at the hospital. The cause of his death, as finally stated in the death certificate, was coronary sclerosis and chronic myocarditis.

The petitioner, a niece of the deceased, herself a physician and the wife of a physician, admitted in her petition that the appellant had attended the decedent's sister for some time prior to her death and visited the decedent on numerous occasions during his lifetime. There is no evidence in the record to show that the petitioner herself had ever visited or ministered to the deceased or his sister during their lives.

The decedent became seriously ill in the fall of 1934 and on January 7, 1935, wrote that he was so ill he had to have a doctor come to see him twice a week and that he considered that his " days are numbered."

The gift *causa mortis* was fully testified to by Mrs. Amy Grier of Waterbury, Conn., who had worked with the appellant in the Manhattan Eye, Ear and Throat Hospital. Her testimony was clear, convincing and satisfactory. She stated that on January 11, 1935, when the gift was made, the appellant and Mrs. Grier had spent two hours with the deceased in his room at Mrs. Daly's. She testified the deceased said he was very ill and very much worried about his health and before they left he went to a trunk, brought out an envelope, stated he did not feel that he had very long to live and that he wanted the appellant to have " these stocks and bank books if I should die," adding that he would keep one bank book in which there was enough and more to carry him along during the remainder of his life. She testified that the appellant took the envelope containing the stock certificates and the three bank books away with her to her room at the hospital where the witness saw them; that within the one envelope there were five other envelopes containing the stock and the bank books in question, all of which were identified by the witness on the trial. She further testified that on a prior occasion the deceased

had told her that he would take good care of " Margaret," that is, the appellant, stating " whatever she does for me now will be well paid for."

The learned surrogate apparently did not question the veracity of the testimony of Mrs. Grier, which was characterized by frankness and truth, but interpreted it with other testimony to mean that the property was given by the deceased to the appellant on January 11, 1935 (as it apparently had been on a previous occasion), solely for safekeeping; and that it was in fact returned to the deceased before his death four days later. In his first decision, he referred to a statement made by this witness on cross-examination, that if the deceased had asked for the return of the property Margaret Coffey would have returned it, and added that this negatived a gift. But the witness immediately thereafter testified, " He [the decedent] said he wanted her to have them," and in any event the prior testimony would not negative a gift *causa mortis* as that type of gift is always revocable by the donor at his option at any time before death. (*Ridden* v. *Thrall*, 125 N. Y. 572, 579.)

The surrogate evidently rested his final conclusion on inferences from the testimony of one Dr. Rutledge, called by the administratrix, as he stated in his second opinion that this physician's testimony established by itself that the subject-matter of the alleged gift was in the deceased's possession at the time of his death.

As we read the evidence, the doctor did not, and, from the nature of his testimony, could not have so testified. He stated that he arrived in the deceased's room about eight-thirty P. M., on January 14, 1935 (the decedent had died there about three-thirty that afternoon); that he remained long enough to make out a death certificate " and that took probably five minutes;" that he gave the death certificate to the undertaker, Mr. Dunworth, who was also present in the room at the time; that while he was filling out the death certificate the appellant was looking into a trunk at one side of the room and after seeing her do that, he said she had bank books and some stock in her hands. He admitted that he did not " see the stocks or how many they were or anything else," also that he did not see her take any bank books from the trunk but " thought they came from the trunk." " Q. Did you see where they came from? A. I didn't see her reach right down in the trunk and take them out." He did not testify as to the number of the bank " books;" he said he saw and made no mention of the envelopes in which the stock and the bank books concededly were kept and produced at the trial. He was not asked to and did not identify any of the books or any of the certificates of stock, but stated that the appellant told him at the time " that the bank

books, as I understood it, were about $6,000 in bank stock, and one of these insurance, the Home Fire Insurance stocks amounted to about $9,000." It is to be noted there is no Home Fire Insurance and bank stock in the disputed property and that one bank book was not claimed by the appellant but had been retained by the deceased at the time of the delivery of the property on January eleventh. The physician also testified that the appellant on the occasion in question had said that she did not know how she would ever be paid what the deceased owed her.

This physician's testimony with regard to the physical condition of the deceased on the date that he last saw him, January 7, 1935, one week before his death, is still more unsatisfactory. Testifying that nothing had been said by the decedent on that occasion as to his expectation of the imminence of death, he also volunteered the statement that that was the last thing the deceased " thought of at that time." In this he was contradicted by a letter concededly written by the decedent on the very day in question (January 7, 1935), in which he stated that he was afraid that his days were numbered, that the doctor pretended to see an improvement in him but he was sorry to say that he could not agree with him. That letter conclusively shows the keen apprehension the deceased felt at that very time with regard to his health and the imminence of death.

If we eliminate from the basis of the decision the erroneous impression from the appellant's letter of January 12, 1934, the doctor's testimony is no longer supplemented, as the court had at first assumed it was, by any admission by the appellant that the property had been returned after January eleventh, and, therefore, the court's conclusion ultimately reposed upon the testimony of the physician alone. Against this, the clear and convincing testimony of Mrs. Grier, that the transaction of January eleventh was not a delivery to the appellant for safekeeping but a gift *causa mortis* stands without being shown to be false in any respect. It is corroborated, too, by the testimony of Thomas Dunworth, also a disinterested witness, that the deceased had repeatedly said that he would take care of the appellant and see that she was provided for. Added to this is the uncontradicted evidence of the appellant's years of loyalty and devotion to the deceased and his sister and the deceased's reiterated statement that he would reward her for her services and help. Indeed, all the facts and circumstances establish the inherent likelihood of the gift as testified to, and even assuming the truth of the physician's testimony, we find nothing sufficient to establish revocation of the gift or return of the property to the deceased before his death.

The essential requisites for a gift *causa mortis* were stated in *Grymes* v. *Hone* (49 N. Y. 17, 20), as follows: " Three things are necessary. 1. It must be made with a view to donor's death. 2. The donor must die of that ailment or peril. 3. There must be a delivery." It is not essential that the donor be *in extremis* with no time or opportunity to make a will. In many of the reported cases the gift was made weeks or even months before actual death took place; and it has even been held that it is not essential that the donor die from the specifically apprehended disease if before recovery from that disease he die from some other disease also existing at the time. (*Ridden* v. *Thrall*, 125 N. Y. 572, 579, and cases cited.) If the donor recover from the apprehended illness or survive the impending peril, the gift thereby becomes void; and, unlike a consummated gift *inter vivos*, a gift *causa mortis* is revocable at any time by the donor and becomes void by the death of the donee in the lifetime of the donor. (*Ridden* v. *Thrall, supra; Grymes* v. *Hone, supra.*) Where the property is shown to have been owned by the deceased in his lifetime, the burden of establishing the gift with a fair preponderance of the evidence rests upon the one who asserts the gift (*Matter of Housman*, 224 N. Y. 525; *Caldwell* v. *Lucas*, 233 id. 248, 254); and in view of the death of the man against whose estate the claim is made, the proof of gift should be clear, convincing and satisfactory. (*Matter of Van Alstyne*, 207 N. Y. 298, 308; *Ward* v. *New York Life Ins. Co.*, 225 id. 314, 322; *Matter of Booth*, 215 App. Div. 516, 521.)

Gifts made in prospect of death are not favored or encouraged by the courts, but when the proof establishes a valid gift of that nature, it should be upheld. (*Bedell* v. *Carll*, 33 N. Y. 581.) After a careful review of all the testimony, we conclude that a gift *causa mortis* of the property in suit by the deceased to the appellant on January 11, 1935, was clearly established within the rules laid down by the authorities we have quoted, and title to the property in question having vested in the appellant and not having been divested by revocation or otherwise, the property was hers at the time of the deceased's death on January 14, 1935.

Accordingly, the decree appealed from should be reversed, with costs, and the petition dismissed.

Martin, P. J., and Townley, J., concur; O'Malley and Cohn, JJ., dissent.

Decree reversed, with costs, and the petition dismissed.