In the Matter of the Estate of OTTO PRESENDER, Deceased. SAMUEL PRESENDER, as Coadministrator of the Estate of OTTO PRESENDER, Deceased, Appellant; SADYE SEIDEMAN, Respondent.

First Department, November 23, 1954.

*A. Arthur Giden* of counsel (*Giden & Giden,* attorneys), for appellant.

*Beatrice R. Parvin* for respondent.

BREITEL, J. The coadministrator, a surviving brother of the decedent, appeals from a decree in the Surrogate's Court, insofar as it determined that claimant, a surviving sister, was the owner, by virtue of a gift *causa mortis,* of certain United States Savings Bonds of the face value of $4,400.

The principal questions are whether the proof was sufficient to establish a gift *causa mortis,* and if so, whether United States Savings Bonds, Series E, payable to decedent, are transferable by gift *causa mortis.* An incidental question is whether the testimony of decedent's physician was properly received.

The decree of the Surrogate should be affirmed on the ground that there was sufficient proof to establish a gift *causa mortis* in favor of claimant and that United States Savings Bonds may be transferred by gift *causa mortis,* although such bonds are not otherwise voluntarily transferable *inter vivos* under the regulations of the Treasury Department. In so holding it is determined that the testimony of decedent's physician, given on behalf of claimant over the objection of the coadministrator, was improperly admitted in violation of the provisions of sections 352 and 354 of the Civil Practice Act, but that, nevertheless, there was sufficient remaining proof to establish the making of the gift *causa mortis* to a clear and convincing degree.

Decedent was a bachelor who was sixty-eight at the time of his death. He had been a salesman for an infant's wear firm. He had lived in a furnished room on the west side of Manhattan and, apart from his personal effects, had accumulated the Savings Bonds in question with an aggregate face value of $4,400, the sum of $7,630.76 in a savings account, and some cash that was found on his person when he fell dead in a department store. His closest kin were some six brothers and sisters of whom the appealing coadministrator is one and claimant is another. He left no will. After he died decedent's burial expenses were advanced by claimant and the collecting of his personal effects from his furnished room was also handled by her and her husband. It is not disputed that the relationship between decedent and his sister, the claimant in this case, was closer than any he had with his other sisters or brothers.

The events connected with decedent's last illness, the making of the alleged gift of the United States Savings Bonds to his sister and his ensuing death, occurred in rapid sequence. The dates are, therefore, of importance. On November 12, 1951, decedent consulted a physician and was hospitalized on that date until December 3d. He told his brother-in-law, the husband of claimant, that he had been to several doctors; that they had

told him that he had a heart condition; and that he would have to take things easier   After his discharge from the hospital on December 3d, he told his brother-in-law that he had been ordered to take a complete rest and that he had stayed home for, two weeks.   In the middle of December, 1951, he told his brother-in-law " You know, Ted, I've got something on my mind that I want to talk to you about.   I am a pretty sick chap and in order to make sure that things happen the way I want them to I would like to leave everything to Sadye ''.   He said that he wanted his sister, the claimant, to meet him at the bank the following day in order to convert his savings account into a joint account.   Evidently, she did not meet him.   The next week decedent again visited his brother-in-law, but this time he brought a signature card for claimant to sign to effect the change in the savings account and she signed it.   On December 24th, the bank records show, the account was converted from an individual one into a joint survivor account in favor of claimant.*   Towards the end of December decedent went to his employer and asked him for the United States Savings Bonds, payable to decedent, which he had left for safekeeping for a number of years in the employer's safe.   His employer, without asking any questions, gave decedent his bonds.   It was on about December 29th, roughly one week after the events with respect to the savings account, that decedent visited claimant and, according to her husband, handed her the bonds enclosed in an envelope, saying: " Here, these are for you   *   *   * I insist.   I want you to have them in case anything happens to me.''

For some time after the occurrences last related decedent went about his business of selling infant's wear.   On July 17, 1952, he fell dead, as noted earlier, in a department store in Manhattan.

It is now claimed that the proof was insufficient to establish a gift *causa mortis* of the United States Savings Bonds on the ground that there was no evidence that decedent was under apprehension of death and that, in any event, death resulted after so great an interval as to render the gift ineffective.   Moreover, it is urged that the proof is insufficient to show that there was in fact a physical delivery of the bonds to claimant and that the testimony of her husband should not be accepted in the absence of corroboration.   It is also urged that, as a matter of law, United States Savings Bonds, Series E, payable to

---

* The validity of this transfer was questioned by the petition filed by the coadministrator but no proof was presented on the issue raised in the pleadings.

the donor, may not, under the regulations of the Treasury Department, be transferred by gift *causa mortis.*

The testimony of decedent's physician who treated him in November, 1951, was received over objections by the coadministrator. The testimony, in substance, related to the serious heart condition from which decedent was suffering and to the treatment that the physician prescribed for him. This testimony, except as to visits and the mere fact of treatment, was improperly received under sections 352 and 354 of the Civil Practice Act. This was not a will contest; there was no showing that the interest of the personal representative was adverse to the estate; and there was no waiver by the personal representative of the deceased. However, there is other independent and sufficient evidence in the case which establishes the nature of the illness and state of mind of decedent at the time of the alleged gift. These elements and his sudden death some eight months later unfold events, and a relationship of these events, that sustain the finding of the Surrogate.

The prerequisites for a gift *causa mortis* have been well expressed in the leading case of *Ridden* v. *Thrall* (125 N. Y. 572, 579). There it was said:

"Gifts *causa mortis* as well as gifts *inter vivos* are based upon the fundamental right everyone has of disposing of his property as he wills. The law leaves the power of disposition complete, but to guard against fraud and imposition, regulates the methods by which it is accomplished.

" To consummate a gift, whether *inter vivos* or *causa mortis,* the property must be actually delivered and the donor must surrender the possession and dominion thereof to the donee. In the case of gifts *inter vivos* the moment the gift is thus consummated it becomes absolute and irrevocable. But in the case of gifts *causa mortis* more is needed. The gift must be made under the apprehension of death from some present disease or some other impending peril, and it becomes void by recovery from the disease or escape from the peril. It is also revocable at any time by the donor, and becomes void by the death of the donee in the life-time of the donor. It is not needful that the gift be made *in extremis* when there is no time or opportunity to make a will. In many of the reported cases the gift was made weeks, and even months, before the death of the donor when there was abundant time and opportunity for him to have made a will. These are the main features of a valid gift *causa mortis* as they are set forth in many text-books and reported cases."

It is clear that decedent was in apprehension of sudden death arising from his diseased condition. This was after he had suffered the first symptoms of a heart condition, had visited a number of physicians, and had been hospitalized. The transfer of the savings account, the withdrawal of the bonds from his employer, his visits to his sister and his conversation with his brother-in-law — the sequence of events following illness, visits to physicians, hospitalization and discharge — spell out a pattern of planning in anticipation of imminent death. He was not *in extremis*, but he need not have been. While it is true that heart disease may persist for a long period of time before terminating in death, it is not with heart disease as a matter of medical prognosis with which we are concerned. We are concerned with the state of mind of the patient. That state of mind was made evident by his objective conduct and, indeed, by documentation with respect to the bank account.

The coadministrator makes much of the fact that decedent survived the alleged gift for almost seven months, during which time he continued in his occupation. He makes much of the fact, also, that cause of death was never proven since the death certificate, specifying the cause of death, was received in evidence solely for the purpose of establishing the time of death. There might be more to these points if decedent's alleged gift and the transfer of his savings account had occurred at the time of a heart attack or of hospitalization. In that event it might be considered that the alleged gift was made in contemplation only of immediate death arising from the instant medical crisis. Then the situation might have been similar to that described in such detail in *Matter of Reardon* (175 Misc. 1002).

In the *Reardon* case Surrogate DELEHANTY found that since the decedent successfully recovered from a first cerebral hemorrhage and a subsequent attack of heat prostration, there was a revocation of the gift *causa mortis*, made during the heat attack, and that the death from a second hemorrhage which occurred within a month later did not suffice to sustain the gift. In our case decedent made his arrangements in anticipation of his death after discharge from the hospital and after house-rest for two weeks. Hence, these acts were done, very obviously, in realistic recognition that, despite survival of a medical crisis, his life might end at any time without opportunity to make preparation for disposition of his property.

It has always been the rule that there need be no particular time interval between the delivery and the death of the donor. There is no limit. (*Ridden* v. *Thrall*, 125 N. Y. 572, 579, *supra;*

*Grymes* v. *Hone,* 49 N. Y. 17, 21.) In the *Grymes* case there was a lapse of five months. Said the court: '' True, the donor died five months thereafter; but we are referred to no case or principle that limits the time within which the donor must die to make such a gift valid ''.

So again, the fact that the cause of death was not explicitly proven (and we note that it was not and could hardly be proven that decedent died from other than heart disease) is of no materiality. The Court of Appeals, in the *Ridden* case (*supra*) was confronted with a situation where the death did not result from the disease. It was held that the cause of death need not be the disease from which death was apprehended, although it is essential that the donor not recover from such disease. In the *Ridden* case the disease was a hernia. Before the patient had recovered from an operation for the hernia he died of a heart attack. In holding that the gift *causa mortis* was, nevertheless, valid, the court said: '' There is no reason for this additional prerequisite. The rule is that the donor must not recover from the disease from which he then apprehended death. If he recovers the gift is void; if he does not recover, and the gift is not revoked, it becomes effectual. In this case the condition was that if he did not recover from the consequences of the operation and return from the hospital the gift should take effect. That was a perfectly lawful condition for him as the owner of the property to impose, and no reason can be perceived for refusing to uphold a gift made under such circumstances. A donor may have several diseases, and may, in making a gift, apprehend death from one and not from the others, and shall the gift be invalid if before he recovers from the disease feared he dies from one of the other diseases? In such a case it might be, and generally would be, difficult, if not impossible, to tell what share any of the diseases had in causing the death. No medical skill could ordinarily tell that the donor would have succumbed to the disease feared if the other diseases had not been present. Here the immediate cause of death appeared to be heart disease, and the autopsy did not disclose that there was any connection between the hernia or the operation and the heart disease. But who could tell that the death would have ensued from the heart disease at that particular time but for the operation? No medical skill can tell that the shock from the operation, and the debility and disturbance caused thereby did not hasten death; and the death, therefore, in a proper sense, may have ensued, and probably did ensue from both causes.'' (Pp. 580–581.)

It follows, therefore, if the facts have been properly established, that the delivery of the bonds in this case was made in apprehension of death and the gift was never rendered void by recovery from the disease from which the apprehension stemmed. We now turn to whether there was clear and convincing proof of the elements necessary to establish a gift *causa mortis*.

The coadministrator contends that the evidence is insufficient to prove the gift because, he says, the only testimony relied upon by the Surrogate was that of claimant's husband. There is no dispute that the spouse of an alleged donee of a gift *causa mortis* is not an interested party within the meaning of section 347 of the Civil Practice Act. But it is urged that, since gifts *causa mortis* are so susceptible to fraud, the husband's uncorroborated testimony may not support the Surrogate's finding.

We assume for the time being that the husband's testimony to support the delivery in this case was not supported or corroborated. It is clear that, in asserting title to the bonds, claimant has the burden of establishing the elements of a gift *causa mortis*. As in all civil cases, all that is required is a fair preponderance of the evidence. In view, however, of the alleged donor's death, the fact finder is especially required to carefully scrutinize the evidence. This is a salutary rule, based on long experience, that applies to all transactions asserted to have occurred between a living claimant and a deceased person. For that reason it has often been said that, where the evidence consists solely of the testimony of the alleged donee's spouse, the finder of the facts is free to reject it, even though in another case involving living parties it would have been sufficient to sustain the burden of establishing a claim by a preponderance of the evidence (*Matter of Sherman,* 227 N. Y. 350; cf. *Ward* v. *New York Life Ins. Co.,* 225 N. Y. 314, 322, and *McKeon* v. *Van Slyck,* 223 N. Y. 392, 397). Thus it was said in the *McKeon* case (and this language was quoted with approval in the *Sherman* case): " In civil cases a plaintiff is never required to prove his case by more than a preponderance of evidence. This is as true of actions against an executor, founded on claims put forward for the first time after the death of the testator, as it is of other actions. (*Lewis* v. *Merritt,* 113 N. Y. 386.) No doubt in determining whether the preponderance exists, the triers of the facts must not forget that death has sealed the lips of the alleged promisor. They may reject evidence in such circumstances which might satisfy them if the promisor were living. They must cast in the balance the

evidence offered upon the one side and the opportunities for disproof upon the other. They may, therefore, be properly instructed that to make out a preponderance, the evidence should be clear and convincing. (*Roberge* v. *Bonner*, 185 N. Y. 265.) But all these instructions in last analysis are mere counsels of caution. The responsibility of determining whether the evidence is clear and convincing must ultimately rest upon the jury, subject, of course, to the power of the court to set aside their verdict. There is no rule of law that the claimant's contract must be in writing, or even that it must be made out in all substantial particulars by disinterested witnesses.'' (Pp. 397–398.)

But the applicable rules are far from requiring corroboration or supporting evidence, as a matter of law, or that this court necessarily regard the weight of the uncorroborated or unsupported evidence in a light different from the finder of the facts. Thus, in the *Sherman* case it was specifically held that it was not essential, as a matter of law, that '' interested '' witnesses must be corroborated or that a jury should be so instructed.

In so holding we are not unaware of cases which seem to require, as a matter of law, corroboration of the testimony of an alleged donee's spouse. (See e.g., *Matter of McMillan,* 167 App. Div. 817, affd. 218 N. Y. 64; *Matter of Buoninfante,* 125 Misc. 907; *Matter of Davis,* 128 Misc. 622, affd. 222 App. Div. 846.)

The *McMillan* case was decided prior to the *Sherman, Ward* and *McKeon* cases. The *Buoninfante* and *Davis* cases were decided afterwards, but, to the extent that they are inconsistent with the opinions in the *Sherman, Ward* and *McKeon* cases, they should not be followed.

It has been assumed that the testimony of the husband in this case was not corroborated or supported. As a matter of fact there were independent facts in this case that supported his testimony. Claimant had possession of the bonds. This alone is equivocal. But the coadministrator asks us to go further and speculate that claimant obtained possession when she went through decedent's effects at his furnished room. There is nothing to support this speculation. The fact is that there is independent evidence from the lips of the decedent's employer that the employer had kept the bonds in his safe for years, and that, shortly before the alleged delivery to claimant and after decedent's hospitalization, decedent requested a return of the bonds to him. There is the conceded circumstance that decedent and his sister, the claimant herein, had the closest of relationships among the brothers and sisters. There is the documented conversion of the savings account from an individual account

to a joint account roughly contemporaneous with the alleged delivery of the bonds. Any one of these facts alone is equivocal; and upon this state of the proof, the Surrogate was entitled to reject the husband's testimony. But he was equally entitled to accept the complex of facts as clear and convincing evidence of delivery of the bonds as a gift *causa mortis*, in the context outlined by the Court of Appeals in the *McKeon, Sherman* and *Ward* cases. While every precaution should be taken in weighing the testimony of interested witnesses, or those closely related to interested witnesses, involving alleged gifts from persons now dead, we cannot say on this record that the Surrogate had failed to take the necessary precautions and was unjustified in crediting, as he did, the testimony of claimant's husband. It cannot be gainsaid that the law does not favor and should not favor the assertion of gifts purportedly made by dead men. But the Surrogate had the witnesses before him as he did the other facts in the case that tended to support his finding. Again, it cannot be said that he must have found as he did; but it is also true that there is no requirement, in law or in the facts of this case, that this court find otherwise than he did. Accordingly, the elements necessary to establish a gift *causa mortis* are found to exist in this case.

There remains the question whether United States Savings Bonds, Series E, which in this case were payable to decedent and issued between October, 1942, and September, 1945, were transferable on the death of decedent as gifts *causa mortis*. This question has perturbed the courts in a number of jurisdictions and the conclusions are not in agreement.

The regulations of the Treasury Department with respect to Savings Bonds have varied from 1935 to the present. (Those pertinent to the bonds in this case are: Code of Fed. Reg., tit. 31, § 315.1 *et seq.*; Code of Fed. Reg., Cum. Supp., tit. 31, § 315.1 *et seq.*; Code of Fed. Reg., 1945 Supp., tit. 31, § 315.1 *et seq.*) In all there has been provision for nontransferability of Savings Bonds. The wording has varied, but the more recent reads: " Savings Bonds are not transferable and are payable only to the owners named thereon, *except in case of the disability or death of the owner,* authorized reissue, or as otherwise specifically provided in this subpart, *but in any event only in accordance with the provisions of the regulations in this part.* A savings bond may not be hypothecated or pledged as collateral for a loan or used as security for the performance of an obligation, except as provided in § 315.12 ". (Code of Fed. Reg., 1945 Supp., tit. 31, § 315.11.) (Emphasis supplied.)

In section 315.13 of the same regulations, it is provided that recognition would be given to judicial proceedings determining ownership, which, according to the caption of the section, relate to "judgment creditors, trustees in bankruptcy, receivers of insolvents' estates and conflicting claimants." It is then further provided in that section that: "(a) No such proceedings will be recognized if they would give effect to an attempted voluntary transfer inter vivos of the bond or would defeat or impair the rights of survivorship conferred by the regulations in this part upon a surviving coowner or beneficiary".

It is interesting to note that in the earlier regulations this provision was narrowly confined to judicial proceedings in aid of creditors. (See Code of Fed. Reg., tit. 31, § 315.15; Code of Fed. Reg., Cum. Supp., tit. 31, § 315.51.) It is in the later years that the language of the section and its caption are broadened to cover more than creditors' rights, and finally to include "conflicting claimants".

With respect to the administration of estates of deceased owners there has always been provision for payment or re-issue of the bonds to the qualified representative of the estate, or to persons entitled to share in the estate or to "the person entitled thereto as determined by the court". (Code of Fed. Reg., 1945 Supp., tit. 31, § 315.47.)

Viewing these regulations in their entirety it appears that the policy of nontransferability, which is an essential feature of the Savings Bonds program, is limited to attempted voluntary transfers by living owners to take effect during their lives. There are many provisions for transferring the bonds upon death. It is evident that the Treasury has no particular interest in the devolution of property. It does, however, have a distinct interest in making Savings Bonds nonnegotiable and nontransferable, except to the extent that such transferability would be controlled by actuarial factors, such as death. The provisions for leaving the determination of interests in bonds held by a decedent owner to courts in the administration of estates is further evidence of the limited extent of Treasury policy. Thus, where the regulation (§ 315.11) provides that bonds are not transferable except on death, and then only in accordance with regulations, that language is to be related to that portion of the regulations giving effect to judicial determinations and the administrations of decedents' estates (§ 315.13; § 315.47).

In some States the courts have held that the regulations expressed a virtually unlimited policy of nontransferability, and, on that ground, have held that gifts *causa mortis* could not be

made of United States Savings Bonds, payable to the donor. (*Connell* v. *Bauer,* 240 Minn. 280; *Moore's Adm'r.* v. *Marshall,* 302 Ky. 729 [1946].) Other courts have held that the Federal regulations do not prevent disposition of Savings Bonds, *inter vivos* or *causa mortis,* so long as the procedure for registration is followed. Here the emphasis is that oral testimony should not be substituted for the regulations requiring writings or be permitted to go beyond them. (*Fidelity Union Trust Co.* v. *Tezyk,* 140 N. J. Eq. 474 [1947]; *Nelson* v. *Wheeler,* 127 Mont. 56.)

On the other hand, courts in other jurisdictions have considered the regulations as merely protecting the Government from becoming a party to litigation between claimants and providing that the Treasury is discharged if it pays on the bonds in accordance with its regulations. The view is that there is no purpose to establish a uniform system of devolution of property in savings bonds so long as the Government is protected in making payment in accordance with judicial determination. It has been held, therefore, that the regulations contemplate recognition of such local rules as may exist with respect to the devolution of property, including those relating to gifts *causa mortis.* (*Dietzen* v. *American Trust & Banking Co.,* 175 Tenn. 49 [1939]; cf. *Marshall* v. *Felker,* 156 Fla. 476 [1945].)

In this State there are but two cases that have flatly decided the question. They are in conflict with each other. One arose in the City Court of the City of New York. (*Bergman* v. *Greenwich Sav. Bank,* 74 N. Y. S. 2d 638.) In that case, Mr. Justice CARLIN, relying on an earlier dictum of Surrogate FOLEY, held that the effect of the Federal regulations was clearly to invalidate a gift *causa mortis* of savings bonds, payable to the donor. Surrogate FOLEY had so stated in the case of *Matter of Owens* (177 Misc. 1006). The *Owens* case did not involve a gift *causa mortis.* There the decedent in his lifetime had purchased bonds in the names of his nephews. He had given them the bonds, but later he asked them to return the bonds to him. It was this return of the bonds that the executor unsuccessfully urged was a valid gift to the decedent. Surrogate FOLEY, in discussing the regulations commented generally that no gift, pledge, or other voluntary transfer of savings bonds could be valid. But, on any theory it was an *inter vivos* gift and invalid under the regulations. Moreover, the regulations read somewhat differently at that time and the provision relating to judicial determination was then, as pointed out earlier, narrowly confined to creditors' remedies. These are the negative authorities in this State. In

the other case that flatly decided the question, *Matter of Borchardt* (179 Misc. 456), Surrogate McGarey sustained a gift *causa mortis* of savings bonds. He did so on the theory that the regulations prohibit transfer except on death, and added, that in the case of death further provision is made for determination of interests claimed in such bonds.

For reasons already detailed there is no occasion for Treasury policy to limit transferability of savings bonds effective on death. There is nothing in the regulations to prohibit such transfer. Certainly in the intervening years no effort has been made to revise the regulations (although they have been considerably revised in general) with respect to invalidating gifts *causa mortis*. More than that, there are provisions which evidently recognize the occasion of such transfers.* The provisions with relation to judicial proceedings and judicial determination of interests in bonds and their ownership have been broadened to include precisely the determination made in this case by the court below. Thus we have seen the paragraph of the regulations with respect to judicial proceedings broadened and, most significantly, its title amended to include " conflicting claimants ". (Code of Fed. Reg., 1945 Supp., tit. 31, § 315.13.) Consequently, the right of an owner to make a gift *causa mortis* of United States Savings Bonds, payable to him, under the existing regulations is sustained.

Accordingly, in this case there was sufficient proof of a delivery of the bonds and of an intention to make a gift *causa mortis,* and, as a matter of law, such a gift of the bonds was permissible under the regulations of the Treasury Department.

The decree of the Surrogate should be affirmed in all respects, with costs to the respondent, payable only out of the estate, to the extent that the assets are sufficient, but not otherwise.

Peck, P. J., Callahan, Bastow and Bergan, JJ., concur.

Decree, so far as appealed from, unanimously affirmed, with costs to the respondent, payable only out of the estate, to the extent that the assets are sufficient, but not otherwise. [See *post,* p. 806.]

---

* In the instant case there was received in evidence, without objection, a letter from an official in the Treasury Department to the effect that " There is no restriction in the regulations against a gift causa mortis of savings bonds, and such a gift will be recognized if the bonds are submitted with an appropriate request for payment or reissue by the donee of the gift and a certified copy of a decree of a court of competent jurisdiction establishing the validity of such a gift. * * * In the absence of such order or decree, the bonds must be considered as belonging to the estate of the deceased registered owner and may be paid or reissued only upon the request of the administrator."