In the Matter of the Estate of CLARENCE A. KELSEY, Deceased. FIRST NATIONAL BANK OF LOCKHAVEN, as Ancillary Administrator C. T. A., Appellant; R. JAN FITZPATRICK et al., Respondents.

Fourth Department, April 4, 1968.

*Wightman & Hille (Robert M. Wightman* of counsel), for appellant.

*Joseph J. Nasser,* special guardian for infant respondents.

WITMER, J. This appeal accents the adage that " hard cases make bad law ". The record in this case shows beyond doubt that the testator wished to make a gift to the infant respondents. The facts surrounding the pertinent events are undisputed; but the inferences of fact which may and must be drawn therefrom lead inexorably to the legal conclusion that no gift

was made, and require reversal of the decree and judgment entered below.

This is an appeal by the ancillary administrator with the will annexed from the decree and judgment of the Surrogate entered upon the verdict of a jury in the trial of the issue of whether the testator had made a gift *inter vivos* or *causa mortis* to the infant respondents of $17,000 in cash and a promissory note upon which $5,000 remained unpaid. The jury upheld the alleged gift; and the decree and judgment from which petitioner appeals declare that the infant respondents are the owners of said property.

The testator, Clarence A. Kelsey, resided and died in Pennsylvania, and the property in question was in Pennsylvania at the time of the alleged gift and at the time of his death. On the evening following testator's funeral the property was turned over to the infant respondents by testator's nephew; and they and their parents removed it to a bank in Steuben County, State of New York. Petitioner then secured its appointment in this State for the purpose of instituting this discovery proceeding for the recovery of the property. Since the testator and the property were, prior to his death, at all times in Pennsylvania, Pennsylvania law governs the validity of the alleged gift. (*Hutchison* v. *Ross,* 262 N. Y. 381; *Matter of Bloch,* 186 Misc. 705.) Without objection the Surrogate took judicial notice that the law of Pennsylvania respecting gifts is the same as the law of New York. With respect to the facts in this case we find that to be substantially true, and we shall supplement the citations of Pennsylvania opinions with citations of New York cases.

Testator was unmarried, and for many years roomed and boarded with Mr. and Mrs. Ray Moore, the maternal grandparents of the infant respondents, in Flemington, Pa. In 1946 the Moores' daughter, Barbara, married R. Jan Fitzpatrick, and the young couple resided in an apartment in the Moore residence. Later the Moores moved away, but Jan and Barbara remained, and testator continued to live in the house and to board with them. The infant respondent Jan, Jr. was born there in 1947, and testator became very fond of him, and in the 1950's he and Jan, Jr. became great friends, and used to hunt and fish together. In 1953 the Fitzpatricks moved to Pultney, where the infant respondent Guy was born to them the same year. The testator continued to live in Flemington, but the Fitzpatricks visited him often, and he visited them, and each Thanksgiving Day and Christmas Day he had dinner with them either at their home or at the home of the Moores.

On Thanksgiving Day in 1961 at the home of the Moores testator became ill. He was then 76 years old. He had a stomach operation on December 26, when it was learned that he had cancer. He left the hospital on January 15, 1962 to live with his sister, Mrs. Cook, in Lockhaven, Pa. She prepared a makeshift bedroom for him in the dining room of her home. Her son, Bobbie B. Clark, lived nearby. Testator was very ill and weak; and Bobbie got a hospital bed and a wheelchair for his use on his arrival in Lockhaven; and on the first day Bobbie lifted him from the bed to the wheelchair and took him to the bathroom. On the next day Bobbie also got him out of bed, but it was such a strain on testator that the latter said that he would not try it again. He did not get out of the bed again until he was returned to the hospital, unconscious, where he died three days later on March 12, 1962.

On January 17, 1962 when testator's nephew, Bobbie, visited him, the testator asked him to go to his Flemington apartment and bring certain items which testator listed for him. Bobbie went at once with Mr. Moore, the grandfather of the infant respondents who apparently still owned the premises, and brought the items which were in a metal box to the testator as requested. The testator unlocked the box and checked off the contents. He picked up two paper bags and said to Bobbie, '' If anything happens to me, these should go to the boys ''. Bobbie says that he knew whom testator meant, because he had often spoken of them. The testator handed the box back to Bobbie and said, '' Where are we going to keep these?'' Bobbie further testified: '' He locked the box again and I had to move his bed away to get to a bureau or buffet that had a drawer across the top and doors on either end and one door locked, and my mother had the key to that. We locked the box up in there and I moved the bed back. It was parallel to the buffet so that he could reach up to the top to get his cigarettes and medicine. There wasn't too much room between the bed and the buffet ''. When the testator locked the box he handed the key to Bobbie. In answer to the question, '' You of your own free will kept them in the china closet?'' Bobbie answered, '' We talked it over and decided we would keep it in the china closet with the other key ''.

Bobbie's mother had the key to the locked door of the buffet where the box was placed. She kept that key in a china closet on the other side of the bedroom, three feet from testator's bed. When the buffet was locked and testator's bed was moved back against its doors, the key to it and the testator's keycase containing the key to the box were placed in the china closet.

Bobbie's mother knew where the keys were. The buffet was at testator's right as he sat in the bed, and the china closet was to his left.

Bobbie never saw the testator open the buffet or metal box after that. The testator received visitors, including the Fitzpatricks on two or three occasions, but never mentioned the box or contents to Jan, nor to Bobbie.

After testator's death and in the presence of Bobbie's aunt and another uncle Bobbie opened the testator's metal box, and for the first time saw what was in the paper sacks. The box contained a ring, a watch, some government bonds, testator's will, and numerous personal effects, including a candy box containing Indian relics and coins, besides the discharge papers and the two paper bags. Later that day he brought together his mother, aunt and surviving uncle, and also Mr. and Mrs. Fitzpatrick and their two sons, respondents herein, and told them about testator's conversation with him, and he delivered the two paper sacks to the two boys. One bag had written on it "R. Jan Fitzpatrick, the boy", and it contained $6,000 in cash and a promissory note, payable to the testator in the face amount of $5,500 upon which $500 had been credited. The other bag had no writing on it. It contained $11,000 in cash in $1,000 wrappers. At this time the Fitzpatricks had moved to Bath, New York; and the cash and note were placed in a bank at nearby Hammondsport, New York.

Apparently testator never mentioned his proposed gift to anyone but his nephew.

At the close of the evidence upon the trial petitioner moved for a directed verdict; and the motion was denied.

The court submitted to the jury the questions whether the testator had made a gift *inter vivos* or *causa mortis* to the infant respondents. He charged that in order for them to find that a gift had been made they must find that the testator *intended* to give said property to respondents, that he *delivered* it to them in fact or symbolically by delivering the key to a box to or for them intending thereby to give the contents of the box to them; and that the latter must have accepted the gift. He charged that "only when the donor has lost or surrendered all control of the subject matter, is the delivery complete". He added that a gift *causa mortis* "is a gift to take effect at the time of the giver's death", and that such a gift requires intent, delivery and acceptance just as in the case of a gift *inter vivos*, "and in addition the donor must have died from the existing ailment or peril without revocation of the gift". He further charged that the respondents had the burden

of proving the gift by a fair preponderance of the credible evidence. No exception was taken to the charge.

Petitioner's attorney requested the court "to charge the jury that if the jury finds that Clarence Kelsey delivered this property to Bobbie Cook as his agent to make delivery to these boys that the intended gift was revoked at the death of the donor." Respondents' attorney replied, "I have no objection. If they find he delivered it as an agent for the boys, there was a gift"; and the court so charged.

The burden of proving that a gift was made is upon the one asserting it (*Matter of Sivak,* 409 Pa. 261, 266; *Matter of Kelly,* 285 N. Y. 139, 150; *Matter of Housman,* 224 N. Y. 525). That proof must be established by "clear, convincing, and satisfactory" evidence (*Rankin* v. *Kabian,* 414 Pa. 554, 557; *Matter of Sivak, supra,* p. 265), but this does not mean that the donee must prove the gift by more than a fair preponderance of the evidence, but that his evidence will be more carefully and critically scrutinized. (*Caldwell* v. *Lucas,* 233 N. Y. 248, 254; *Ward* v. *New York Life Ins. Co.,* 225 N. Y. 314, 322; *Matter of Malysiak,* 15 A D 2d 586, 587; *Matter of Albert,* 68 N.Y.S. 2d 539, 542.) The charge in this respect was correct, but could well have been amplified.

The Surrogate was also correct in his statement of the three elements of an *inter vivos* gift, that is, intent, delivery and acceptance; although in Pennsylvania acceptance is often not listed as a necessary element, it being usually presumed. (*Rankin* v. *Kabian, supra,* p. 554; *Matter of Sivak, supra,* p. 261; *Matter of Rynier,* 347 Pa. 471.) In New York where intent and delivery are present, "acceptance, also, may be implied where the gift, otherwise complete, is beneficial to the donee". (*Beaver* v. *Beaver,* 117 N. Y. 421, 429; to like effect, see *Matter of Ream,* 413 Pa. 489 and *Matter of Rynier, supra*; and see 25 N. Y. Jur., Gifts, § 27.)

The same elements required for a valid *inter vivos* gift must be present in a gift *causa mortis* (*Matter of Sivak, supra,* 25 N. Y. Jur., Gifts, § 50), and in addition the donor must be apprehensive of death from a present illness or peril (*Matter of Hennessy,* 253 App. Div. 6, 11, affd. 278 N. Y. 538); and that is sufficient even though death does not follow for many months (*Matter of Presender,* 285 App. Div. 109, 113–115). The court's charge that such a gift is "to take effect at the time of the giver's death" was correct if it was meant to state that title to the subject of the gift does not completely vest until his death (*O'Mara* v. *Dentinger,* 271 App. Div. 22, 28); but it was not particularly helpful because the intent and the delivery

must be complete at the time of the gift (*Ridden* v. *Thrall,* 125 N. Y. 572; *Matter of Presender, supra*), and it could well have confused the jury as to the necessity for such completed delivery.

The only differences between an *inter vivos* gift and one *causa mortis* are that in the latter (1) the gift must be made when the donor is apprehensive of death from some present illness or impending peril, (2) it is revocable by the donor in his lifetime, and (3) the gift is revoked in law if the donor does not die from such illness or peril (*Matter of Ream,* 413 Pa. 489, *supra*; *Matter of Sivak,* 409 Pa. 261, *supra*; *Titusville Trust Co.* v. *Johnson,* 375 Pa. 493; *Ridden* v. *Thrall, supra,* p. 579).

In the case at bar the testator had undergone a serious illness, and justifiably may have been in apprehension of death therefrom. That is enough, without express statement by the testator that he was apprehensive of death, to raise a presumption that he acted with such apprehension (*Matter of Ream, supra,* p. 491; .*Titusville Trust Co.* v. *Johnson, supra,* p. 499; *Grymes* v. *Hone,* 49 N. Y. 17, 21–22).

Nor would the fact that the testator had not indorsed the note over to respondent R. Jan Fitzpatrick, Jr. stand in the way of its being a completed gift. If need be, equity will require testator's legal representative to affix the necessary signature to effectuate the gift (*Titusville Trust Co.* v. *Johnson, supra,* p. 500; *Matter of Chapple,* 332 Pa. 168, 173; *Matter of Maijgren,* 193 Misc. 814, 819–820; *Matter of Downey,* 68 N. Y. S. 2d 407, 411).

It is clear from the evidence, and the jury certainly was at liberty to find, that the testator intended to give the two bags with their contents to the infant respondents. The only element of gift *causa mortis* lacking in this case is that of delivery. Effective delivery must put the subject of the gift out of the testator's possession and control. (*Matter of Ream,* 413 Pa. 489, 493, *supra*; *Matter of Van Alstyne,* 207 N. Y. 298, 306; *Beaver* v. *Beaver,* 117 N. Y. 421, 429, *supra*; *Curry* v. *Powers,* 70 N. Y. 212, 217.) This can be done symbolically by delivery to the donee of the key to a box or drawer containing the subject of the gift (*Matter of Adler,* 191 App. Div. 40, affg. 107 Misc. 574). Since the jury has found that a gift was accomplished in this case, our immediate question is, do the facts of this case, as a matter of law, permit a jury to find that delivery was made of the two paper bags to testator's nephew and that he received them on behalf of the infant respondents on that day in mid-January, 1962? That is a question of law for the court (*Matter of Sivak,* 409 Pa. 261, 266, *supra*). In determining this question,

of course, we must accord to respondents the benefit of every proper inference of fact which the jury could have drawn from the evidence. (*Titusville Trust Co. v. Johnson,* 375 Pa. 493, 497.) Viewing the evidence in such light, we think that there was no issue of fact as to delivery for submission to the jury, and that the motion by the administrator with the will annexed for a directed verdict should have been granted.

The name "R. Jan Fitzpatrick, the boy" was on one bag, and under some circumstances, though the bag was found in the donor's possession after death, such a writing might carry a presumption of prior delivery and acceptance. (See *Miller v. Silverman,* 247 N. Y. 447, 450–451; Gift by Written Instrument — Delivery, Ann. 48 ALR 2d 1405, 1414, *et seq.*) But here the testimony of the nephew establishes that although those words were previously on the one bag, they did not constitute an admission by the testator that the bag belonged to respondent Jan, for the testator implied that it still was his property, and he said, in effect, that upon his death he wanted the nephew to give it to Jan (see *Matter of Van Alstyne,* 207 N. Y. 298, 307–308, *supra*). Thus, up to this time, that is, mid-January 1962, he was retaining control over it, and it cannot be said that the writing was sufficient to make it Jan's property (see *Matter of Earley,* 198 Misc. 727, 730, *et seq.*).

The charge which petitioner requested of the court and to which respondents' attorney said he had no objection, to wit, that if testator delivered the property to his nephew as his agent to make delivery to the infants, the intended gift was revoked by testator's death prior to delivery by the agent to the infants, is good New York law (*Matter of Szabo,* 10 N Y 2d 94; *Farmers' Loan & Trust Co. v. Winthrop,* 238 N. Y. 477, 485–487; *Wadd v. Hazelton,* 137 N. Y. 215; *Matter of Lafler v. O'Brien,* 1 A D 2d 84; *Matter of Green,* 247 App. Div. 540, 545–546) as is the counter-request that if testator made delivery to the donees' agent, it would be sufficient (*Bump v. Pratt,* 84 Hun 201, 204; *Vincent v. Rix,* 248 N. Y. 76); although the latter agency must be established and will not be implied to make complete an inchoate gift (*Farmers' Loan & Trust Co. v. Winthrop, supra; Matter of Bolin,* 136 N. Y. 177; *Young v. Young,* 80 N. Y. 422). The charge, however, was incorrect in this regard with respect to Pennsylvania law, which provides that actual delivery to a third person with instructions to deliver the subject to the donee on the donor's death constitutes an effective gift. (*Matter of Rynier,* 347 Pa. 471.) This difference between Pennsylvania and New York law, however, is of no help to respondents, because in both States there must at least

be a delivery to someone to put the property out of the donor's immediate control.

In *Vincent* v. *Rix* (248 N. Y. 78, 83, *supra*) the court said: "The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit; there must be a change of dominion and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given." (And, see, *Matter of Szabo,* 10 N Y 2d 94, 98; 25 N. Y. Jur., Gifts, § 15.)

Applying these principles to the facts of this case, delivery cannot be found. The testator did not hand the two paper bags to his nephew to hold and deliver to the respondent boys as their agent on testator's death. He showed them to his nephew, said, "If anything happens to me, these should go to the boys ", and placed them back into *his* metal box. In that box he had many other items of his property which he was not giving to the infant respondents or to the nephew to hold for them, including his will, government bonds, a ring, watch, Indian relics and coins, army discharge papers and other personal effects. In other words, *he intended to retain possession of the box and its contents.* He locked the box with its contents, handed it to his nephew, and said, "Where are we going to keep these?" The nephew decided to place them, that is, the metal box and contents, in the buffet, but does not know how he arrived at that decision. To do this he moved the bed away from the front of the buffet, unlocked a door of the buffet, put the box in it and locked the door. He then moved the bed back against the buffet so that it could not be opened without moving the bed in which the testator lay. The keys to the buffet and the box were placed in the china closet, three feet from testator's bed. The nephew never saw them again until after testator's death.

Clearly, testator was in possession of and had dominion over that box and the keys so long as he was in that room (*Matter of Ream,* 413 Pa. 489, 493). The fact that he did nothing further about the box is immaterial; it was there and it was still his property unconditionally (*Matter of Martella,* 390 Pa. 255; *Viggiani* v. *Favata,* 257 App. Div. 346). Even if it could be said that the nephew had joint control of the box with the testator, which is giving respondents the most they can hope for, it would not help them (*Matter of Sivak,* 309 Pa. 261, 265–6, *supra; Matter of Martella, supra; Matter of Grossman,* 386 Pa. 647; *Matter of Kelly,* 285 N. Y. 139, 149–150, *supra; Matter of Bolin,* 136 N. Y. 177, *supra; Young* v. *Young,* 80 N. Y. 422, *supra; Matter of Narganes,* 161 App. Div. 563, 567, affd. 213

N. Y. 659; *Matter of Canfield,* 176 App. Div. 554, 557; *Matter of Bashford,* 178 Misc. 648; 25 N. Y. Jur., Gifts, § 15, p. 159).

Thus, although the evidence is clear, and strengthened by the fact that it comes from a witness whose interests presumably are adversely affected, that testator wanted to make a gift, it must be held that he failed to effectuate it. The way for a donor to retain complete control of his property and still lawfully determine its course after his death is by making a will which provides for its disposition (*McCarthy* v. *Pieret,* 281 N. Y. 407, 413; *Matter of Earley,* 198 Misc. 727, 730, *supra*).

We find that the allowance made to the special guardian was excessive.

Accordingly the decree and judgment should be reversed, on the law and facts, the respondents directed to deliver said property to petitioner, and the fee of the special guardian reduced to the sum of $1,500, plus his disbursements.

WILLIAMS, P. J., BASTOW, MARSH and HENRY, JJ., concur.

Decree and judgment unanimously reversed, on the law and facts, without costs, respondents directed to deliver property to petitioner, and fee of the special guardian reduced and fixed at the sum of $1,500 plus disbursements.